UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>(1) JOEL ENRIQUE ARMENTA CASTRO and<br>(2) GERARDO MADRIGAL QUINTERO,<br><br>Defendants. | M.J. No.  22-1369-DLC<br><br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A CRIMINAL COMPLAINT**

I, Bryan Marks, being sworn, state:

**Introduction and Agent Background**

1. I am a Sergeant with the Norfolk County Sheriff's Office ("NCSO") and currently assigned to the Federal Bureau of Investigation ("FBI") and the New England Organized Crime Drug Enforcement Task Force ("OCDETF") in Watertown, Massachusetts. I have been a Corrections Officer, serving full-time with NCSO from 2004 to present day.  Since 2014, I have served as the Warrant Enforcement Officer and Background Investigator for the NCSO.  Since October 2019, I have been assigned as a Task Force Officer ("TFO"), defined as a sworn Special Federal Officer, with the FBI.  I am an investigative or law enforcement officer of the United States and authorized to exercise the powers of enforcement set forth in 21 U.S.C § 878.  I am deputized pursuant to Tile 28, Federal Code of Regulations, sections 0.112 and 0.19A, and I am charged with the duty of investigating violations of the laws of the United States as stated in Title 28, Federal Code of Regulations, by order of the Attorney General of the United States.

2. In the course of my law enforcement career, I have received training from the Massachusetts Municipal Police Training Committee ("MPTC"), New England State Police

Information Network ("NESPIN"), the FBI, and the NCSO in (among other things) basic narcotics investigations, drug identification, drug detection, interdiction, familiarization with narcotics laws, identification and seizure of drug related assets, organized crime investigations, and physical and electronic surveillance techniques.

3. Over the past two years, I have been involved in federal and state narcotics investigations that have led to numerous arrests for possession, distribution, and trafficking controlled substances. I have participated in the execution of over fifteen warrants for narcotics offenses. I have seized narcotics and evidence of crimes as a result of the execution of these warrants.

4. My primary duties as an FBI TFO include the investigation of organized narcotics traffickers, narcotics distribution, and money laundering offenses, as well as other federal and state crimes. I have participated in numerous arrests for both state and federal law violations, seizure of large quantities of controlled substances, physical and electronic surveillance, the execution of warrants and de-briefing of informants. Also, in conjunction with other federal law enforcement agencies, I have participated in investigations of large scale national and international drug trafficking organizations. These investigations have included the introduction of undercover officers and confidential informants into these groups, and the implementation of electronic surveillance, including but not limited to, wiretapping and global positioning systems ("GPS").

5. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.

6. Based on my training and experience, I am familiar with the vernacular used by consumers and distributors of illegal narcotics. I have observed numerous types of controlled

substances and I am familiar with the packaging, pricing structure, distribution methods, and street jargon associated with their sale and use. I have also encountered and become familiar with the various tools, methods, trends, and paraphernalia used by drug traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances.

## Purpose of the Affidavit

7. I submit this affidavit in support of a Criminal Complaint, charging JOEL ENRIQUE ARMENTA CASTRO (hereinafter, "CASTRO") and GERARDO MADRIGAL QUINTERO (hereinafter, "QUINTERO") with violating Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii) (distribution and possession with intent to distribute 5 kilograms or more of cocaine). In addition, I submit this affidavit in support of detention of CASTRO and QUINTERO pending trial.

8. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is submitted for the limited purpose of establishing probable cause to believe that CASTRO and QUINTERO committed the above offense. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. I have set forth only the facts that I believe are needed to establish the requisite probable cause.

## Probable Cause

9. In August 2022, a cooperating witness (hereinafter, "CW-1")[1] provided investigators with information about a cocaine supplier in Mexico, known only as "David" (hereinafter, "DAVID"), who could transport multiple kilograms of narcotics to Massachusetts.

---

[1] CW-1 is cooperating in exchange for immigration benefits and monetary compensation.

CW-1 has been cooperating with the FBI since September of 2021. In August of 2022, CW-1 and DAVID had multiple communications through the WhatsApp message application. During the communications, DAVID discussed sending large quantities of cocaine and fentanyl to the Boston area. DAVID told CW-1 that he would send twenty kilograms of cocaine and one kilogram of fentanyl to the Boston area as a sample. DAVID also discussed the possibility of eventually shipping eighty to one hundred kilograms of narcotics to Boston, in order to establish a distribution network in the Boston area.

10. On August 27, 2022, CW-1 advised investigators that DAVID sent a person from Mexico to Boston. At the direction of investigators, on August 29, 2022, a second cooperating witness (hereinafter, "CW-2")[2] communicated with DAVID through WhatsApp to discuss the delivery. The communications were recorded and preserved as evidence. DAVID told CW-2 that the drugs were in Boston and that CW-2 needed to have someone pick up the drugs from a tractor trailer that was waiting in the Boston area. DAVID also told CW-2 to communicate with the individual who was in Boston. Thereafter, at the direction of investigators, CW-2 called an unidentified male using telephone number ending in 1778. This call was recorded and preserved as evidence. Investigators subsequently identified that individual as Joel Enrique Armenta CASTRO.[3] CASTRO told CW-2 that "they" sent him there and that he was at a hotel near the Boston airport. Based on the background of the investigation, I believe that CASTRO was

---

[2] CW-2 has a criminal history that includes convictions for drug distribution. CW-2 also lived in the United States for several years under an assumed identity and was arrested for identity theft in 2019. The charge was later dismissed. CW-2 has provided assistance to the FBI on several investigations since 2018, and CW-2 has proven to be reliable.

[3] Investigators identified the unidentified male as Joel Enrique Armenta CASTRO was identified at the time of his arrest by official documents located on his person. Including his Official Mexico Passport and Official United States of America B2 Visa Border Crossing Card.

referring to DAVID and his criminal associates when he said "they" sent him to Boston. During a subsequent call, CW-2 told CASTRO that CW-2 only had $10,000 available to pay, and that CW-2 would pay the balance owed at a later time. CASTRO agreed, and the two arranged to meet at the Hilton Hotel at the Boston airport (hereinafter, the "Hilton Hotel").

11. On August 29, 2022, in advance of the meeting with CASTRO, investigators met with CW-2, searched CW-2 and CW-2's vehicle for drugs, contraband, or personal money with negative results. Investigators equipped CW-2 with electronic audio and video recording equipment that allowed investigators to monitor events in real time, as well as $9,000 in official agency funds. Investigators then followed CW-2 to the Hilton Hotel.

12. Investigators established surveillance in the area of the Hilton Hotel and observed CASTRO get into CW-2's vehicle. At CASTRO's direction, CW-2 then drove CASTRO to the Ludlow Service Plaza on the Massachusetts Turnpike in Ludlow, Massachusetts. Once they arrived at that location, CW-2 provided CASTRO with the $9,000. CASTRO counted the money and confirmed it was $9,000. CASTRO made a phone call to an unknown individual to confirm that the $9,000 was sufficient to complete the deal, and subsequently confirmed to CW-2 that they could proceed.

13. At approximately 4:34 p.m., investigators observed CW-2 park CW-2's vehicle in front of a grey tractor trailer truck (hereinafter, the "Tractor Trailer"), then observed CASTRO get out of CW-2's vehicle and get into the passenger side of the Tractor Trailer. Shortly thereafter, the driver of the Tractor Trailer and CASTRO both got out of the Tractor Trailer and walked to the rear of the trailer, where the driver opened the rear doors and CASTRO removed a blue duffle bag from the trailer. CASTRO then walked with the blue duffel bag back to CW-2's vehicle, placed the duffel bag in the back seat of CW-2's vehicle and got back into the front passenger seat

of CW-2's vehicle. Once back inside CW-2's vehicle, CASTRO told CW-2 that he had to stay there until it was sold. Based on my training and experience and the background of the investigation, I believe that DAVID and his criminal associates instructed CASTRO that he could not leave the Boston area until after all of the drugs had been sold and he could collect the remaining amount owed. CW-2 and CASTRO then went into the service station and investigators arrested CASTRO.

14. Investigators seized the blue duffel bag from CW-2's vehicle. The bag contained 15 brick-shaped objects. Investigators randomly selected 3 of the brick-shaped objects and performed field tests, all of which were positive for the presence of cocaine. The 15 brick-shaped objects weighed a combined total of approximately 16.9 kilograms, including packaging. Based on the background of the investigation, and my training and experience, I believe that the 15 brick-shaped objects contain cocaine. The suspected cocaine will be sent by investigators to a laboratory for testing and analysis.

15. Investigators conducting surveillance observed the Tractor Trailer depart the services station. At the request of investigators, Massachusetts State Police conducted a motor vehicle stop of the Tractor Trailer and placed the driver into custody. The driver was subsequently identified as Gerardo Madrigal QUINTERO.

16. Based on the information described above, CASTRO and QUINTERO were charged in Massachusetts state court with cocaine trafficking 200 grams or more, as well as conspiracy to violate the Controlled Substance Act. CASTRO and QUINTERO are currently being held at the Hamden County House of Correction in Ludlow, Massachusetts.

## CONCLUSION

17.  Based on the foregoing, there is probable cause to believe that on August 29, 2022, JOEL ENRIQUE ARMENTA CASTRO and GERARDO MADRIGAL QUINTERO did distribute and possess with intent to distribute 5 kilograms or more of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii).

Respectfully submitted,

_Bryan Marks_
Bryan Marks
Task Force Officer, FBI

Subscribed and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on September 9, 2022.

_____
Hon. Donald L. Cabell
United States Magistrate Judge